UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DARREL HAGGOOD, JASON NATHANIEL,
and SHAKEERA HODGE,

                              Plaintiffs,

          -against-

RUBIN & ROTHMAN, LLC, MARY LACOSTE,
and KATHIE RUSSO,

                              Defendants.
-------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   NOV 1 7 2014   ★

**LONG ISLAND OFFICE**

**ORDER**
14-cv-341(SJF)(AKT)

FEUERSTEIN, District Judge

On January 16, 2014, plaintiffs Darrel Haggood ("Haggood"), Jason Nathaniel

("Nathaniel") and Shakeera Hodge ("Hodge") (collectively, "plaintiffs") filed an employment

discrimination complaint against defendants Rubin & Rothman, LLC ("R&R"), Mary Lacoste

("Lacoste") and Kathie Russo ("Russo") (collectively, "defendants"), alleging discrimination on

the basis of race, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. §§ 2000e, *et seq.*; Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981

("Section 1981"); and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§

296, *et seq*. On or about April 4, 2014, plaintiffs filed an amended complaint against defendants,

alleging discrimination on the basis of race, retaliation and a hostile work environment in

violation of Title VII, Section 1981 and the NYSHRL. Defendants now move to dismiss

plaintiffs' claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

for failure to state a claim for relief. In the final sentence of their memorandum of law in

opposition to defendant's motion to dismiss, plaintiffs "request leave to amend their complaint in

1

a manner consistent with the Court's opinion[,]" (Plf. Mem. at 21), in the event "the Court should find in favor of Defendants on any argument." (Id.) For the reasons set forth below, defendants' motion is granted and plaintiffs' request for leave to amend their amended complaint is denied.

I.    BACKGROUND

A.    Factual Allegations[1]

R&R is a consumer collection law firm with is principal place of business in Islandia, New York. (Am. Compl., ¶¶ 14, 19).

At all relevant times, Lacoste was R&R's director of operations and Russo was R&R's collection floor manager. (Am. Compl., ¶¶ 17-18).

1.    Allegations of Hodge and Nathaniel

In or about September 2007, Hodge commenced employment at R&R as a collector in the Collection Department. (Am. Compl., ¶ 26).

In or about October 2008, Amanda Gonzalez ("Gonzalez"), presumably a co-worker of Hodge's, was "reprimanded for using the word 'nigger' on the collection floor in front of African American employees" and was told by Lisa Desz ("Desz"), one of R&R's managers, to refrain from using that word "because it was offensive and not appropriate for the workplace." (Am. Compl., ¶ 28).

---

[1] The following facts are taken from the amended complaint and considered to be true for purposes of this motion only. They do not constitute findings of fact by the Court.

Plaintiffs allege that "[o]n or about January 7, 2009, used [sic] the phrase 'nigger knocking' in the presence of [] Hodge. Gonzalez then asked [] Hodge if she ever heard of 'nigger knocking.' [] Hodge informed Gonzalez that she found the phrase offensive." (Am. Compl., ¶ 29). Later that same date, Hodge complained to Lacoste about Gonzalez's use of that phrase on the collection floor. (Id., ¶ 30). In Hodge's presence, Lacoste "again asked Gonzalez to refrain from using that term in the office because it is offensive[,]" but defendants failed to otherwise take any "disciplinary action to eradicate the racial harassment taking place in [R&R's] offices." (Id., ¶ 31).

"On or about October 2010, Gonzalez asked [] Hodge's supervisor, Brad Kimble ['Kimble'], 'What's up nigger?'" (Am. Compl., ¶ 32). According to plaintiffs, "[d]efendants failed to take appropriate disciplinary action to correct Gonzalez's third known use of racially offensive language on [] R&R's premises." (Id.)

On or about July 1, 2011, after Hodge asked whether "he would like to contribute to a collection for a pregnant co-worker," Raymond Mendez ("Mendez") responded, "'Nah nigga, we are doing one with Carina.'" (Am. Compl., ¶ 33). When Hodge asked Mendez "to refrain from using that term because it was offensive[,] Mendez replied[,] 'Should I call you niggarette then?'" (Id., ¶ 34). Hodge again "asked Mendez to refrain from using such offensive language." (Id.) That same afternoon, Hodge "reported Mendez's comment to several of her supervisors, including [] Lacoste and Russo." (Id., ¶ 35).

On July 6, 2011, Hodge "filed a formal complaint regarding Mendez's use of racially offensive language on the collection floor on July 2 [sic], 2011." (Am. Compl., ¶ 36). Although Mendez admitted to using the racially offensive terms while speaking with Hodge on the

collection floor, "[d]efendants failed to take appropriate disciplinary actions to eradicate the racial harassment taking place in its offices." (Id., ¶¶ 37-38).

In or about July 2011, Nathaniel commenced employment as a collector in R&R's Collection Department. (Am. Compl., ¶ 77).

On or about August 10, 2012, when Hodge "spoke briefly with [] Nathaniel while [she] was sending a fax and [] Nathaniel was waiting for a call to be answered[,] Desz immediately ordered [them] to stop talking" ("the fax machine incident"). (Am. Compl., ¶ 39; see also id., ¶ 79 ["On or about August 10, 2012, [] Nathaniel engaged in a brief conversation with [] Hodge while [] Hodge was sending a fax and [] Nathaniel was waiting for a call to be answered * * * [and] Desz immediately ordered [them] to stop talking."]) Plaintiffs allege, "[u]pon information and belief[,] [that] Desz did not reprimand non-African American employees for talking while sending a fax." (Id., ¶¶ 39, 79).

On or about August 14, 2012, Hodge "made a formal complaint about the fax machine incident * * *." (Am. Compl., ¶ 40). According to plaintiffs, Lacoste (1) "interviewed several non-African American employees who were not involved in the [fax machine] incident[,]" but did not interview Nathaniel, (id., ¶¶ 41, 80); and (2) reprimanded Hodge and Nathaniel for talking at the fax machine, but not Desz "for discriminatorily reprimanding [them][,]" (id., ¶¶ 42, 81).

On or about September 4, 2012, Hodge complained to Lacoste "that all of the African American employees were seated in a segregated area[,]" but Lacoste "failed to address [her] complaint of racial segregation." (Am. Compl., ¶ 43).

On or about October 11, 2012, Frank & Associates, P.C. informed R&R that they were representing Hodge on her racial discrimination claims against it. (Am. Compl., ¶ 44).

4

On or about December 11, 2012, Kimble asked Hodge "to escort another employee, Vanetta Harris ['Harris'], outside to help calm [her] down[,]" following a "verbal altercation with Desz[.]" (Am. Compl., ¶ 45). Upon returning to the building, Russo confronted Hodge and Harris and asked, "'Can't you all just do some work?'" (Id., ¶ 46). When Hodge attempted to explain what had happened, Russo refused to listen, (id., ¶ 47), and prevented Kimble from entering the area where they were talking ("the December 2012 incident"). (Id., ¶ 49). During the ensuing conversation with Russo, Hodge also complained that on or about November 29, 2012, "[d]efendants had sent six (6) African American employees home for wearing jeans to the office while a client was present," but did not send Rissa Nesbitt ("Nesbitt"), a non-African American employee who was also wearing jeans in the office while a client was present, home or otherwise discipline her in any manner. (Id., ¶ 48).

"On December 13, 2012, without conducting an investigation, [d]efendants falsely accused [] Hodge of engaging in a verbal altercation with [] Russo on December 11, 2012, gave her a written warning, and recommended that she contact [] R&R's Employee Assistance Program ['EAP'] for anger management training * * *." (Am. Compl., ¶ 50). According to plaintiffs, "[t]his was the first written warning [] Hodge received in her five years of employment with [] R&R[,]" (id.); Russo "was not accused of engaging in a verbal altercation, was not given a written warning, and was not told to contact the [EAP] for anger management training[,]" (id., ¶ 51); and "Desz and Harris were not written up for the [December 2012] incident[,]" (id., ¶ 52). Plaintiffs allege, "[u]pon information and belief, [that] non-African American employees were involved in verbal altercations on [] R&R's premises, but were not written up for those incidents." (Id., ¶ 53).

Plaintiffs allege: (1) that Hodge has not received a raise or performance bonus since the December 2012 incident, "purportedly because of a 'wage freeze' instituted by [] R&R[,]" (Am.

Compl., ¶ 54); and, (2) "[u]pon information and belief, [that] since December 2012, [] R&R has given several employees raises and performance bonuses, and hired new employees at significantly higher rates of pay than its current employees, despite the alleged 'wage freeze[,]'" (id., ¶ 55).

2. Allegations of Haggood and Nathaniel

On or about January 31, 2012, Haggood commenced employment as a collector in R&R's Collection Department. (Am. Compl., ¶ 57).

In or about August 2012, Haggood and Nathaniel were members "of the Dormant Judgment Group ['DJG'], managed by Kimble, an African American male[,] * * * comprised mainly of African American employees, and * * * seated in an area segregated from non-African American employees." (Am. Compl., ¶¶ 58, 78).

Plaintiffs allege that during the week of August 13, 2012, while Haggood and Nathaniel were sitting with two (2) other African American employees during a break, Desz "stood up and glared at them[,]" which made them "extremely uncomfortable because they were being watched at all times, including personal break time." (Am. Compl., ¶¶ 59, 82).

On or about August 17, 2012, while waiting for a call to be answered, Haggood asked a co-worker whose grandmother had died how she was doing, for which Desz berated him. (Am. Compl., ¶¶ 60-61). According to plaintiffs, "[a]t the same time, non-African American co-workers were engaging in personal conversations during work hours on the collection floor." (Id., ¶ 61). Later that morning, "Desz switched seats with another employee, Rosette Telemaque, so that she could watch [] Haggood work[,]" (id., ¶ 62), and then "had another manager * * * sit in Telemaque's seat so that [she] could watch [] Haggood work[,]" (id., ¶ 63). Plaintiffs allege,

6

"[u]pon information and belief, [that] Desz singled out African American employees for excessive scrutiny." (Id., ¶ 65).

"In or about the middle of August 2012, the [DJG], including [] Haggood and Nathaniel, had a meeting with Kimble in the lunch room[,]" to which Desz listened "through the cafeteria door." (Am. Compl., ¶¶ 66, 83). On or about August 22, 2012, Haggood (1) "made a formal complaint to [] Russo that Desz listened to the [DJG] meeting through the cafeteria door[,]" (id., ¶ 67); and (2) asked Nathaniel "a work-related question about the foreclosure process, because Kimble was not available[,]" for which they were both "berated" by Desz for engaging in conversation, (id., ¶¶ 68, 84).

According to plaintiffs, at some unspecified time, Haggood complained to Lacoste "that Desz did not allow African American employees to ask each other work related questions[,]" (Am. Compl., ¶ 69), but Lacoste "failed to take appropriate disciplinary actions against Desz * * *[,]" (id., ¶¶ 71, 86). Plaintiffs allege, "[u]pon information and belief[:]" (1) that "non-African American employees were not berated for asking each other work related questions[,]" (id., ¶¶ 70, 85); and (2) that "other managers of [] R&R did not prohibit employees from asking each other work related questions and having brief conversations while waiting for calls to be answered[,]" (id., ¶ 72).

Plaintiffs allege that "[o]n or about September 4, 2012, [d]efendants dismantled the [DJG] and transferred [] Haggood [and Nathaniel] to a different collections group, under circumstances giving rise to an inference of discrimination, after Kimble filed a claim of race discrimination against [] R&R." (Am. Compl., ¶¶ 73, 87). According to plaintiffs, Haggood and Nathaniel were "transferred to another African American supervisor, Wright[,]" (id., ¶¶ 74, 88),

7

as a result of which they "lost the opportunity to earn bonus compensation based on [their] collection goals in the [DJG]." (Id., ¶¶ 75, 89).

"In or about early November 2012, Defendant reduced the number of clients that were assigned to [] Nathaniel, which made it nearly impossible for [him] to reach his collection goals and earn the performance bonuses associated with achieving those goals." (Am. Compl., ¶ 90). According to plaintiffs, "[t]hroughout November 2012, [] Nathaniel asked [] Russo and his then Manager, Rich Szollosi ['Szollosi'], a white male, for help in reaching his collection goals[,]" (id., ¶ 91), but they "ignored [his] requests and provided no assistance or advice to help him reach his collection goals[,]" (id.).

In or about January 2013, Nathaniel was interviewed by the EEOC with respect to Kimble's discrimination claim against R&R. (Am. Compl., ¶ 92).

"On or about January 2, 2013, [] Nathaniel was seated separately from all other employees." (Am. Compl., ¶ 93). According to plaintiffs, Nathaniel's complaints about his seating assignment to Russo, Szollosi and Frank Rothman ("Rothman"), R&R's owner, were ignored. (Id., ¶ 93).

On or about January 5, 2013, Lacoste terminated Nathaniel's employment at R&R. (Am. Compl., ¶ 94).

On or about April 10, 2013, Haggood's employment at R&R was terminated. (Am. Compl., ¶ 76).

B.    Procedural History

On January 16, 2014, plaintiffs filed an employment discrimination complaint against defendants alleging discrimination on the basis of race and retaliation in violation of Title VII, Section 1981 and the NYSHRL. On or about April 4, 2014, plaintiffs filed an amended complaint against defendants alleging, *inter alia*, that defendants: (1) "discriminated against [them] in the terms and conditions of their employment * * * by taking adverse employment actions against [them] based on their race," (Am. Compl., ¶¶ 96, 99, 103), in violation of Title VII (first claim for relief), Section 1981 (second claim for relief) and the NYSHRL (third claim for relief); (2) that defendants "retaliated against [them] for opposing discrimination on the basis of race by taking adverse employment actions against [them] after they reported acts of racial discrimination," (id., ¶¶ 106, 110, 113), in violation of Title VII (fourth claim for relief), Section 1981 (fifth claim for relief) and the NYSHRL (sixth claim for relief); (3) that defendants "created and maintained a work environment of pervasive discriminatory intimidation, ridicule, and severe insults that altered the conditions of [their] employment[,] * * * created and maintained a work environment where disparate treatment of African American employees and the use of racial slurs, epithets, and jokes on the collection floor interfered with [their] ability to perform their job functions[,] * * * [and] subjected [them] to an ongoing pattern of racially offensive and humiliating conduct[,]" (id., ¶¶ 117-119, 124-126, 131-133), in violation of Title VII (seventh claim for relief), Section 1981 (eighth claim for relief) and the NYSHRL (ninth claim for relief); and (4) that "Russo and Lacoste aided and abetted Defendant R&R in discriminating against [them], retaliating against [them], and allowing a hostile work environment to exist at Defendant R&R by repeatedly ignoring [their] complaints of racial discrimination, allowing the use of racial

9

slurs, epithets, and jokes on the collection floor, failing to adequately discipline employees who used racially offensive language and who targeted African American employee for discipline, and for allowing adverse employment actions to be taken against [them][,]" (id., ¶ 137), in violation of the NYSHRL (tenth claim for relief). Plaintiffs allege that "supervisors[,] [] other employees" and/or "management personnel" at R&R created a hostile work environment for African American employees, including themselves, by (1) "[r]egular[ly] and repeated[ly]" (a) using "the words 'nigger,' 'nigga,' and 'niggarette[,]'" and other racial slurs and epithets, "to or about African American employees" and (b) "making [] racial jokes to or about African American employees * * *[;]" (2) "selectively scrutinizing performance, prohibiting Plaintiffs and other African American personnel from asking each other work related questions, and reprimanding Plaintiffs and other African American employees in front of other employees;" (3) creating "[s]egregated seating in the collections department;" and (4) "[i]gnoring Plaintiffs' repeated complaints of discrimination, harassment, and disparate treatment * * *." (Am. Compl., ¶ 20).

Defendants now move to dismiss the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief and plaintiffs perfunctorily request leave to amend their amended complaint.

## II.    DISCUSSION

### A.    Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L.

Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Id.

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678, 129 S. Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to

the assumption of truth." Id.; see also Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); see also Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 729-30 (2d Cir. 2013) (accord). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014).


B.     Title VII Claims against the Individual Defendants

"Employers, not individuals, are liable under Title VII." Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); see also Raspardo v. Carlone, — F.3d —, 2014 WL 4958157, at * 12 (2d Cir. Oct. 6, 2014) (holding that Title VII "does not create liability in individual supervisors and co-workers who are not the plaintiffs' actual employers[.]"); Spiegel v. Schulmann, 604 F.3d

12

72, 79 (2d Cir. 2010) ("[T]he remedial provisions of Title VII * * * do not provide for individual liability.") Accordingly, the branch of defendants' motion seeking dismissal of plaintiffs' Title VII claims against Lacoste and Russo (collectively, "the individual defendants") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiffs' Title VII claims, i.e., their first, fifth and seventh claims for relief in the amended complaint, are dismissed in their entirety with prejudice as against the individual defendants for failure to state a claim for relief.

C.     Discrimination Claims

Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). "The NYSHRL mirrors these federal obligations." Brown v. Daikin America Inc., 756 F.3d 219, 226 (2d Cir. 2014).

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts * * * as is enjoyed by white citizens[] * * *." "For the purposes of § 1981, the term 'make and enforce contracts' includes 'the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship[,]' [42 U.S.C.] § 1981(b)[,] * * * [and] 'thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment.'" Green v. District Council 1707, No. 13 Civ. 8671, 2014 WL 3734101, at * 4 (S.D.N.Y. July 29, 2014) (quoting Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004)). "The statute has long been viewed as prohibiting certain forms of discrimination based

13

on race, * * * [and] applies to acts of private racial discrimination." Albert v. Carovano, 851 F.2d 561, 571 (2d Cir. 1988). "Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory[] * * * and racially motivated." Id.

"The substantive standards applicable to claims of employment discrimination under Title VII[] * * * are also generally applicable to claims of employment discrimination brought under § 1981 * * * and the NYSHRL * * *." Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010); see also Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (holding that courts analyze "Title VII, § 1981, and NYHRL discrimination claims under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) [].") In order to establish a *prima face* case of employment discrimination under any of those statutes, a plaintiff must show: "(1) that he belonged to a protected class; (2) that he was qualified for the position * * *; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Abrams v. Dep't of Public Safety, 764 F.3d 244, 251-52 (2d Cir. 2014); accord Kirkland v. Cablevision Systems, 760 F.3d 223, 225 (2d Cir. 2014).

"The *sine qua non* of a * * * discriminatory action claim under Title VII is that the discrimination must be *because of* [a protected characteristic]." Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (emphasis in original) (quotations and citation omitted); see also Ricci v. DeStefano, 557 U.S. 557, 577, 129 S. Ct. 2658, 174 L. Ed. 2d 490 (2009) ("A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job related action." (quotations and citation omitted)). "It is axiomatic that mistreatment at work . . .

14

is actionable under Title VII only when it occurs because of an employee's * * * protected characteristic." Patane, 508 F.3d at 112 (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)); see also Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (accord). Although plaintiff is not required "to plead specific facts to show a *prima facie* case of discrimination * * * dismissal is nevertheless appropriate where the plaintiff failed to allege even the basic elements of a discriminatory action claim." Maldonado v. George Weston Bakeries, 441 F. App'x 808, 808-09 (2d Cir. Dec. 19, 2011) (summary order); see also Patane, 508 F.3d at 112 n. 3 (affirming dismissal where the plaintiff "failed to allege even the basic elements of a discriminatory action claim."); Jackson v. NYS Dep't of Labor, 709 F. Supp. 2d 218, 229 (S.D.N.Y. 2010), appeal dismissed, 431 F. App'x 21 (2d Cir. June 15, 2011) (holding that although the plaintiff "need not allege each element of a prima facie claim to survive a motion to dismiss, * * * the facts alleged at the very least must indicate the possibility that she was discriminated against on the basis of [a protected characteristic].")

As relevant here, "circumstances that give rise to an inference of discriminatory motive include actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, * * * [or] preferential treatment given to employees outside the protected class[] * * *." Chertkova v. Connecticut Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996) (citations omitted); see also Patane, 508 F.3d at 112 (finding that the complaint did not "set forth any factual circumstances from which a [discriminatory motive] * * * might be inferred[,] [insofar as] [i]t [did] not * * * allege that * * * any of the [] defendants[] made any remarks that could be viewed as reflecting discriminatory animus[,] * * * [n]or [did] it allege that any [] employees [outside the protected class] were given preferential treatment when compared to

plaintiff.")

Although plaintiffs allege: (1) that on or about September 4, 2012, the DJG, comprised "mainly," but not exclusively, of African-American employees, was dismantled and Haggood and Nathaniel, and presumably the other members of the group, both African-American and non-African American, were transferred to a different collections group; (2) that approximately two (2) months later, i.e., in or about early November 2012, (a) the number of clients assigned to Nathaniel were reduced, making it "nearly impossible for [him] to reach his collection goals[,]" (id., ¶ 90), and (b) Nathaniel's requests to Russo and Szollosi for assistance in reaching his collection goals were ignored; (3) that Hodge has not received a raise or performance bonus since the December 2012 incident, purportedly due to a "wage freeze," although, "[u]pon information and belief, * * * R&R has given several employees [whose identities and race are not specified] raises and performance bonuses, and hired new employees [whose identities and race are not specified] at significantly higher rates of pay than its current employees, despite the alleged 'wage freeze[,]'" (id., ¶ 55); (4) that approximately three (3) weeks later, Nathaniel "was seated separately from all other employees[,]" (id., ¶ 93), including, presumably, other African American employees, then his employment at R&R was terminated; and (5) that Haggood's employment at R&R was terminated on or about April 10, 2013, the amended complaint does not contain any factual allegations from which it may reasonably be inferred that any of those acts occurred under circumstances giving rise to an inference of discriminatory intent. Specifically, the amended complaint is devoid of any factual allegations from which it may reasonably be inferred that the individual defendants, or any other decision-making employee of R&R, made any remarks that could be viewed as reflecting discriminatory animus, or that any non-African

16

American employee was given preferential treatment when compared to plaintiffs with respect to those actions. Accordingly, to the extent plaintiffs base their race discrimination claims upon the aforementioned acts, those claims are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

Plaintiffs' allegations of race discrimination, thus, amount to the following: (a) that over a two (2)-year period, between October 2008 and October 2010, a co-worker of Hodge's was reprimanded, but was not otherwise disciplined, for using an offensive racial slur on R&R premises on three (3) occasions; (b) that approximately nine (9) months later, on or about July 1, 2011, another co-worker of Hodge's used an offensive racial slur while speaking with Hodge on the collection floor, but was not disciplined after admitting that he did so; (c) that over one (1) year later, i.e., in August 2012, (i) Desz (A) reprimanded and/or berated Hodge and Nathaniel and Haggood and Nathaniel for talking together during work hours, and berated Haggood for talking to a co-worker during work hours, although, "[u]pon information and belief, [she] did not reprimand non-African American employees for talking [under similar circumstances]," (Am. Compl., ¶¶ 39, 79; see also, id., ¶¶ 61, 70, 85), (B) glared at Haggood and Nathaniel while they were sitting together during a break and listened to a DJG meeting through the cafeteria doors because, "[u]pon information and belief, * * * [she] singled out African American employees for excessive scrutiny[,]" (id., ¶ 65), and (ii) Lacoste reprimanded Hodge and Nathaniel for talking during working hours, but did not reprimand or otherwise discipline Desz after they, and Haggood, complained to her about Desz's purported discriminatory treatment of them; (d) that approximately two (2) to three (3) weeks later, i.e., on or about September 4, 2012, Hodge complained to Lacoste that all of the African American employees were seated in a segregated

area, but Lacoste failed to address that complaint; and (e) that more than three (3) months later, i.e., on or about December 13, 2012, Hodge was given a written warning for engaging in a verbal alteration with Russo two (2) days earlier, but (i) Russo was not also given a written warning for engaging in that verbal altercation, and, (ii) "[u]pon information and belief, non-African American employees [who] were involved in verbal altercations on [] R&R's premises[] * * * were not written up for those incidents[,]" (id., ¶ 53). For the reasons set forth below, it may not reasonably be inferred from any of those allegations that the challenged acts occurred under circumstances giving rise to an inference of discriminatory intent.

1.      Racially Discriminatory Comments

In determining whether a challenged remark is probative of discriminatory intent, courts should consider the following four (4) factors:

> "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149-50 (2d Cir. 2010); see also Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., — F. App'x —, 2014 WL 4958166, at * 2 (2d Cir. Oct. 6, 2014) (summary order). However, none of those factors are dispositive. Henry, 616 F.3d at 150.

Although the challenged comments are undoubtedly racially offensive and discriminatory, the amended complaint alleges only that two (2) of Hodge's co-workers uttered those comments on four (4) occasions over an approximate thirty-three (33)-month period ending in July 2011,

18

more than one (1) year prior to any purported adverse employment action being taken against her. There are no allegations, *inter alia*: (1) that either of the individual defendants, or any other decision-making employee at R&R, uttered any racially discriminatory or offensive comment; or (2) that any racially discriminatory comments were ever uttered (i) by anyone on R&R's premises after July 1, 2011, more than one (1) year prior to any purported adverse employment action, or (ii) in relation to a decision-making process that resulted in an adverse employment action to plaintiffs. See, e.g. Wesley-Dickson, — F. App'x —, 2014 WL 4958166, at * 2 (concluding that remarks, assumed to be racially biased, did not raise a triable issue of employment discrimination because (1) the individual that uttered them "did not review the plaintiff's work, write any performance reviews, or otherwise influence the school superintendents' decisions to extend plaintiff's probationary term or to deny her tenure[,]" and (2) they were made six (6) months before the alleged adverse employment actions); Lioi v. New York City Dep't of Health & Mental Hygiene, 914 F. Supp. 2d 567, 586 (S.D.N.Y. 2012) (finding that the plaintiff failed to establish a *prima facie* case of discrimination because the discriminatory comments were made "almost a full year before [she] was suspended, and more than a year before her termination" and there was no evidence, *inter alia*, that the comments were in any way related to the decision-making process that resulted in the adverse employment actions). Since it cannot reasonably be inferred that defendants acted with discriminatory intent from the racially discriminatory comments made by Hodge's co-workers more than one (1) year prior to any purported adverse action being taken against plaintiffs, to the extent plaintiffs base their race discrimination claims upon those comments, those claims are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

## 2. Disparate Treatment

"Where a plaintiff seeks to derive an inference of discrimination from allegations of disparate treatment, he or she must plausibly allege the existence of at least one comparator who was more favorably treated despite being 'similarly situated to the plaintiff in all material respects,' meaning the comparator was '(1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct.'" Green, 2014 WL 3734101, at * 5 (quoting Ruiz v. County of Rockland, 609 F.3d 486, 493-94 (2d Cir. 2010)); see also Raspardo, — F.3d —, 2014 WL 4958157, at * 25 ("In order to raise an inference of discrimination through a showing of disparate treatment, the plaintiff must demonstrate that the employer treated him or her less favorably than a similarly situated employee outside of the protected group. * * * A similarly situated employee is one 'similarly situated in all material respects to the plaintiff.'" (quotations and citation omitted)); Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) ("What constitutes 'all material respects' [] varies somewhat from case to case and * * * must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness.") "At the motion to dismiss stage * * * a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated." Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011). "Thus, well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient * * *." Id.

To the extent plaintiffs seek to compare themselves to Desz and Russo, i.e., by alleging that Lacoste reprimanded them and not Desz, and that Russo was not treated the same as Hodge following their verbal altercation, they, as plaintiffs' supervisors, are clearly not similarly situated to plaintiffs in all material respects.[2] It may not reasonably be inferred from the factual allegations in the Amended Complaint that any non-African American employee similarly situated to plaintiffs in all material respects was subject to differential treatment by defendants because, *inter alia*, with the exception of Desz and Russo, who are not similarly situated to plaintiffs, the Amended Complaint is entirely devoid of any details regarding the purported comparators, e.g., who they are, what their positions or responsibilities were at R&R, how their conduct compared to plaintiffs' or how they were treated differently by defendants. Since all of plaintiffs' allegations, made "upon information and belief," pertaining to the treatment non-African American employees received at R&R are entirely conclusory, they are not entitled to the assumption of truth and are insufficient to withstand a motion to dismiss. See, e.g. Albert, 851 F.2d at 572 ("The naked allegation that [the defendants] 'selectively enforc[ed] the College rules. . . against plaintiffs. . . because they are black [or] Latin' is too conclusory to survive a motion to dismiss." (second and third brackets in original)); Kajoshaj v. City of New York, No. 11-cv-4780, 2013 WL 249408, at * 2 (E.D.N.Y. Jan. 23, 2013), aff'd, 543 F. App'x 11 (2d Cir. Oct. 15, 2013) (holding that the plaintiffs' allegation that "[u]pon information and belief, non-Muslim students from families of non-Albanian origin at the [] Academy received test scores and grades

---

[2] Moreover, with respect to Desz, plaintiffs do not even allege that she engaged in comparable conduct to them, i.e., plaintiffs allege that Lacoste reprimanded them for talking during work hours, but failed to reprimand Desz for "discriminatorily reprimanding" them, not for also talking during work hours.

21

similar to [the infant plaintiff] in the fifth grade class for the 2009-2010 school year and were promoted to the sixth grade by the [] Academy[,]" absent any "specific factual allegations concerning th[o]se allegedly similarly situated individuals, was "a bare conclusion [that] cannot survive a motion to dismiss."); D.F. v. Board of Educ. of Syosset Cent. Sch. Dist., 386 F. Supp. 2d 119, 128 (E.D.N.Y. 2005), aff'd, 180 F. App'x 232 (2d Cir. May 9, 2006) (holding that the plaintiff's allegation that "upon information and belief, other students attending middle school within the School District who engaged in similar or more severe conduct * * * received suspensions of a lesser duration than [the plaintiff's]," absent the identity of any similarly situated individual "or any set of facts in support of his allegations of disparate treatment," was "wholly conclusory[] and * * * insufficient to defeat a motion to dismiss."); cf. JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 526-27 (S.D.N.Y. 2013) (holding that although a plaintiff may plead facts alleged upon information and belief 'where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible,' Arista Records[], 604 F.3d [at] 120 [] (citing Iqbal, 556 U.S. at 677, 129 S. Ct. 1937), such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" (quoting Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006))); Navarra v. Marlborough Gallery, Inc., 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011) (accord). "Without factual amplification, the generic allegation[s] of disparate treatment related to an unspecified class of [non-African American] persons is simply not sufficient to 'nudge [] [plaintiffs'] claims across the line from conceivable to plausible,' * * * and thus [are] insufficient to support [their] racial discrimination claim[s]." Henry v. NYC Health & Hosp. Corp., No. 13 Civ. 6909, 2014 WL 957074, at * 7 (S.D.N.Y. Mar.

22

10, 2014) (third brackets in original) (quoting <u>Twombly</u>, 550 U.S. at 570, 127 S. Ct. 1955). Accordingly, the branch of defendants' motion seeking dismissal of plaintiffs' race discrimination claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiffs' race discrimination claims under Title VII (first claim for relief), Section 1981 (second claim for relief) and NYSHRL (third claim for relief) are dismissed in their entirety for failure to state a claim for relief.[3]

### D.    Retaliation and Hostile Work Environment Claims

"The standards for evaluating hostile work environment and retaliation claims are identical under Title VII and the NYSHRL." <u>Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs</u>, 716 F.3d 10, 14 (2d Cir. 2013); <u>see also</u> <u>Summa v. Hofstra Univ.</u>, 708 F.3d 115, 123-5 (2d Cir. 2013). Likewise, Section 1981 retaliation claims "are analyzed pursuant to Title VII principles." <u>Hicks v. Baines</u>, 593 F.3d 159, 164 (2d Cir. 2010); <u>see also</u> <u>Fincher v. Depository Trust and Clearing Corp.</u>, 604 F.3d 712, 720 (2d Ci. 2010).

### 1.    Retaliation Claims

Title VII's anti-retaliation provision provides, in relevant part:

> "It shall be an unlawful employment practice for an employer to discriminate against any of his employees * * * because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

---

[3] In light of this determination, it is unnecessary to consider defendants' remaining contentions with respect to the insufficiency of plaintiffs' race discrimination claims.

42 U.S.C. § 2000e-3(a). In order to establish a *prima facie* case of retaliation, the plaintiff must show: (i) that he or she engaged in a protected activity; "(ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity." Cox v. Onondaga Cnty. Sheriff's Dep't, 760 F.3d 139, 145 (2d Cir. 2014); accord Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013); see also Kirkland, 760 F.3d at 225 ("To state a prima facie case of retaliation under Title VII, a plaintiff must proffer evidence that he engaged in a protected activity, such as complaining about race discrimination, and that his employer took an adverse action in retaliation.")

a.    Protected Activity

"An employee's complaint may qualify as protected activity * * * so long as the employee has a good faith, reasonable belief that * * * she was opposing an employment practice made unlawful by Title VII." Kelly, 716 F.3d at 14 (quotations, brackets and citation omitted). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances[,]" id. (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998)), and "mere subjective good faith belief is insufficient; the belief must be reasonable and characterized by objective good faith." Id. at 16-17 (quotations, brackets, emphasis and citation omitted). "The objective reasonableness of a complaint is to be evaluated from the perspective of a reasonable similarly situated person." Id. at 17.

Although plaintiffs allege that defendants dismantled the DJG after Kimble filed a claim of race discrimination against R&R, as a result of which Haggood and Nathaniel were transferred

24

to a different collections group, thereby "los[ing] the opportunity to earn bonus compensation based on [their] collection goals in the [DJG]," (Am. Comp., ¶¶ 75, 89), they do not allege that they, themselves, engaged in any protected activity for which defendants retaliated against them. In other words, defendants did not transfer Haggood and Nathaniel to a different collections group in retaliation for anything that they, themselves, did. Accordingly, to the extent plaintiffs base their retaliation claim upon the dismantling of the DJG and resulting loss of bonus compensation, those claims are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

### b. Knowledge

"[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Kelly, 716 F.3d at 15 (quoting Galdieri-Ambrosini, 136 F.3d at 292); accord Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107-08 (2d Cir. 2011). "Although particular words such as 'discrimination' are certainly not required to put an employer on notice of a protected complaint, neither are they sufficient to do so if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." Id. at 17.

Although plaintiffs allege that Hodge "made a formal complaint about the fax machine incident[,]" (Am. Compl., ¶ 40), and that Haggood "made a formal complaint to [] Russo that Desz listened to the [DJG] meeting through the cafeteria door[,]" (id., ¶ 67), the amended complaint is bereft of any factual allegations from which it may reasonably be inferred that

defendants knew, or should have known, that those complaints were about a racially discriminatory employment practice. Accordingly, to the extent plaintiffs base their retaliation claims upon Hodge's complaint about the fax machine incident and Haggood's complaint to Russo about Desz's conduct in listening to a DJG meeting, those claims are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

There are no factual allegations in the amended complaint from which it may reasonably be inferred that Nathaniel ever complained to anyone about, or otherwise opposed, a racially discriminatory employment practice at R&R. Although the amended complaint alleges that Nathaniel had an interview with the EEOC with respect to Kimble's discrimination claim against R&R some time in January 2013, the amended complaint claims retaliation only under the opposition clause, not the participation clause, of Title VII's anti-retaliation provision. (See Am. Compl., ¶¶ 106, 110, 113). In any event, the amended complaint is bereft of any factual allegations from which it may reasonably be inferred that defendants knew, or should have known, about Nathaniel's interview with the EEOC at any time prior to taking any of the acts of which he complains in the amended complaint. Accordingly, the branch of defendants' motion seeking dismissal of Nathaniel's retaliation claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and Nathaniel's retaliation claims under Title VII, Section 1981 and the NYSHRL are dismissed in their entirety for failure to state a claim for relief.


c.      Materially Adverse Action

Title VII's "antiretaliation provision, unlike the substantive [anti-discrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of

26

employment[,]" Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006), and "prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Thompson v. North Am. Stainless, L.P., 562 U.S. 170, 131 S. Ct. 863, 868, 178 L. Ed. 2d 694 (2011) (quoting Burlington, 548 U.S. at 68, 126 S. Ct. 2405). "[T]he provision's standard for judging harm [is] objective," Burlington, 548 U.S. at 68, 126 S. Ct. 2405, and "the significance of any given act of retaliation will often depend upon the particular circumstances." Id. at 69, 126 S. Ct. 2405. Thus, whether a particular action is "materially adverse * * * should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Id. at 71, 126 S. Ct. 2405 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). "Title VII * * * does not set forth 'a general civility code for the American workplace[,]' * * * [and] [a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Burlington, 548 U.S. at 68, 126 S. Ct. 2405 (quoting Oncale, 523 U.S. at 80, 118 S. Ct. 998).

Although Hodge alleges that she complained to Lacoste about "racial segregation" at R&R in September 2012, and that R&R was informed in October 2012 that she had retained an attorney to represent her on her race discrimination claims, the only conduct of which Hodge complains that is temporally proximate to those complaints is Hodge's verbal altercation with Russo in December 2012, two (2) to three (3) months later, and the subsequent written warning and recommendation to contact the EAP for anger management training. Plaintiffs do not even allege, however, that those actions were taken in retaliation for Hodge's complaints of racial

27

segregation or discrimination; only that the written warning and recommendation to contact the EAP were discriminatory. Moreover, the verbal altercation itself does not constitute a materially adverse action. See, e.g. Witkowich v. U.S. Marshals Serv., 424 F. App'x 20, 22 (2d Cir. May 27, 2011) (summary order) (holding that the retaliatory acts alleged, including reprimands and criticisms by supervisors, did not constitute adverse actions because they would not have dissuaded a reasonable employee in the plaintiff's position from complaining of unlawful discrimination); E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 848 (S.D.N.Y. 2013) ("[Y]elling, without more, does not constitute an adverse employment action.")

Likewise, although plaintiffs allege that Haggood complained to Lacoste "that Desz did not allow African American employees to ask each other work related questions[,]" (Am. Compl., ¶ 69), at some unspecified time, they do not allege that defendants took any materially adverse action against him in retaliation for that complaint. Accordingly, to the extent plaintiffs base their retaliation claims upon those complaints by Hodge and Haggood, those claims are dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.

### d. Causation

"[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer[,]" University of Texas Southwestern Med. Ctr. v. Nassar, — U.S. —, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013) (5-4 decision), and, unlike Title VII's anti-discrimination provision, "not simply a 'substantial' or 'motivating' factor in the employer's decision." Zann Kwan, 737 F.3d

at 845 (quoting Nassar, — U.S. —, 133 S. Ct. at 2533). "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at 846.

Although "mere temporal proximity between an employer's knowledge of protected activity and an adverse [] action [may be] sufficient evidence of causality to establish a prima facie case [of retaliation,] * * * the temporal proximity must be very close[.]" Clark Cnty Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (quotations and citations omitted); see also Zann Kwan, 737 F.3d at 845 ("[E]ven without direct evidence of causation, 'a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [] action.'" (quoting Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001))); Kaytor v. Electric Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010) ("Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action.") Nonetheless, "there is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship * * *." Abrams, 764 F.3d at 254 (quoting Gorman-Bakos, 252 F.3d at 554).

Assuming, *arguendo*, that Hodge's complaint to Lacoste about Gonzalez's use of a racially offensive term on the collection floor in January 2009, and her comments to Lacoste and Russo about Mendez's use of a racially offensive term in July 2011, constitute protected activity, Hodge does not allege that defendants took any adverse action against her in retaliation for those complaints. Indeed, the first arguably adverse action alleged to have been taken by defendants

against Hodge did not occur until August 2012, when she was reprimanded by Desz and Lacoste for talking with Nathaniel at the fax machine. Plaintiffs do not even allege that Hodge was reprimanded in retaliation for her complaints more than thirteen (13) months earlier and, in any event, the temporal relationship is too attenuated to establish a causal relationship between Hodge's complaints and the reprimands. See, e.g. Richards-Byers v. New York City Dep't of Finance, 449 F. App'x 55, 57 (2d Cir. Nov. 30, 2011) (summary order) (holding that an adverse action occurring more than one year after the protected activity "cannot support an inference of retaliatory intent."); Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) (finding no causal relationship between the protected activity and the alleged adverse action more than thirteen (13) months later).

Likewise, even assuming, *arguendo*, that Haggood's complaints in August 2012 constitute protected activity, the only adverse action allegedly taken against him by defendants was the termination of his employment in April 2013. The amended complaint does not allege that Haggood's employment was terminated in retaliation for his complaints almost eight (8) months earlier and, in any event, the temporal relationship alone is too attenuated to establish a causal relationship between Haggood's complaints and the termination of his employment. See, e.g. Doner-Hedrick v. New York Inst. of Tech., 874 F. Supp. 2d 227, 246 (S.D.N.Y. 2012) (finding no causal relationship between a protected activity and adverse action occurring nearly eight months later); James v. Countrywide Fin. Corp., 849 F. Supp. 2d 296, 314 (E.D.N.Y. 2012) (holding that a passage of between six (6) to eight (8) months between a protected activity and the adverse acts "militates against an inference of retaliation being drawn from the pleadings.")

For all of the foregoing reasons, the branch of defendants' motion seeking dismissal of

plaintiffs' retaliation claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiffs' retaliation claims under Title VII (fifth claim for relief), Section 1981 (fourth claim for relief) and the NYSHRL (sixth claim for relief) are dismissed in their entirety for failure to state a claim for relief.

### 2. Hostile Work Environment Claims

"Title VII prohibits the creation of a hostile work environment." Vance v. Ball State Univ., — U.S. —, 133 S. Ct. 2434, 2441, 186 L. Ed. 2d 565 (2013) (5-4 decision). In order to establish a hostile work environment claim, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." Vance, — U.S. —, 133 S. Ct. at 2441; see also Fincher, 604 F.3d at 723-24 ("In order to establish a hostile work environment claim under 42 U.S.C. § 1981, a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." (quotations and citation omitted)); Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) ("In order to recover on a claim of a racially hostile work environment in violation of Title VII, the plaintiff must establish that his workplace was permeated with instances of racially discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' * * * such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotations and citations omitted))). "In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that the harassment was sufficiently severe or pervasive to

31

alter the conditions of the victim's employment and create an abusive working environment and

(2) that there is a specific basis for imputing the conduct creating the hostile work environment to

the employer." Summa, 708 F.3d at 124 (quoting Duch v. Jakubek, 588 F.3d 757, 762 (2d Cir.

2009)); accord Rojas, 660 F.3d at 106-07.  Moreover, in order to state a discriminatory hostile

work environment claim, the plaintiff must allege "factual circumstances that permit the

inference that the plaintiff was subjected to a hostile work environment because of her [protected

characteristic]." Kelly, 716 F.3d at 14; see also Redd v. New York State Div. of Parole, 678 F.3d

166, 175 (2d Cir. 2012) ("[T]he plaintiff must establish that the hostile or abusive treatment was

because of his or her [protected characteristic].")

Hodge's allegations of a hostile work environment amount to: (1) on three (3) occasions

between October 2008 and October 2010, Gonzalez, a co-worker of Hodge's, uttered racially

offensive terms on R&R's premises, for which she was only reprimanded; (2) approximately nine

(9) months after Gonzalez last uttered a racially offensive term, i.e., in July 2011, Mendez,

another co-worker of Hodge's, uttered a racially offensive term to Hodge on one occasion; (3)

that thirteen (13) months later, i.e., in August 2012, Desz and Lacoste reprimanded Hodge for

talking during work hours; (4) that Lacoste and Russo ignored Hodge's complaints of racial

discrimination in September and December 2012, respectively; (5) that Hodge received a written

warning for engaging in a verbal altercation with Russo in December 2012; and (6) that Hodge

has not received a raise or performance bonus since the verbal altercation with Russo.

Nathaniel's allegations of a hostile work environment amount to: (1) that in August 2012,

(a) Desz reprimanded and/or berated him twice, and Lacoste reprimanded him once, for talking

during work hours, (b) Desz once glared at him and Haggood while they were on break, (c) Desz

32

once listened to a DJG meeting through the cafeteria doors, and (d) Lacoste "failed to take appropriate disciplinary action against Desz," (Am. Compl., ¶ 86); (2) that in September 2012, defendants dismantled the DJG after Kimble filed a claim of race discrimination against R&R, as a result of which Nathaniel was transferred to a different collections group and "lost the opportunity to earn bonus compensation based on [his] collection goals in the [DJG]," (Am. Compl., ¶ 89); (3) that two (2) months later, i.e., in November 2012, the number of clients assigned to Nathaniel were reduced and his requests for assistance in meeting his collection goals were ignored; (4) that approximately two (2) months later, on or about January 2, 2013, he was seated separately from "all other employees," (Am. Compl., ¶ 93), African-American or not; and (5) that on January 5, 2013, Lacoste terminated his employment at R&R.

Haggood's allegations of a hostile work environment amount to: (1) that in August 2012, Desz (a) reprimanded and/or berated him twice for talking during work hours, (b) glared at him and Nathaniel once while they were on break, (c) scrutinized, and had another manager scrutinize, his work performance one day, and (d) once listened to a DJG meeting through the cafeteria doors; (2) that Lacoste "failed to take appropriate disciplinary action against Desz," (Am. Compl., ¶ 71), after he complained that she did not allow African American employees to ask each other work related questions; (3) that in September 2012, defendants dismantled the DJG after Kimble filed a claim of race discrimination against R&R, as a result of which Haggood was transferred to a different collections group and "lost the opportunity to earn bonus compensation based on [his] collection goals in the [DJG]," (Am. Compl., ¶ 75); and (4) that approximately seven (7) months later, Haggood's employment at R&R was terminated.

As set forth above with respect to plaintiffs' discrimination claims, it cannot reasonably

33

be inferred from any of the factual allegations in the amended complaint that any of the aforementioned challenged conduct, with the exception of the use of the racially offensive terms by two (2) of Hodge's co-workers, was taken because of plaintiffs' race. See, e.g. Raspardo, — F.3d —, 2014 WL 4958157, at * 20 (finding that conclusory allegations that unidentified individuals outside the plaintiffs' protected class were treated differently than the plaintiffs were insufficient to establish that the defendants singled out the plaintiffs for adverse treatment based upon their protected characteristic). Indeed, plaintiffs do not even allege: (1) that Hodge was denied a raise or performance bonus because she is African-American; that Nathaniel and Haggood were transferred to a different collections group, thereby purportedly losing their compensation bonus, because they are African American; that the number of clients assigned to Nathaniel was reduced because he is African American; or that Nathaniel's and Haggood's employment at R&R was terminated because they are African American; or (2) that they were treated differently than non-African American employees with respect to such conduct.

a. Severity or Pervasiveness of Conduct

In order to establish a claim of a racially hostile work environment, "the plaintiff must show 'more than a few isolated incidents of racial enmity[.]'" Williams, 171 F.3d at 100-01 (quoting Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir. 1986)). "[T]here must be a steady barrage of opprobrious racial comments,' * * *; evidence solely of 'sporadic racial slurs' does not suffice[.]" Id. at 101 (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)). Accordingly, the use of racially offensive terms on four (4) occasions over a thirty-three (33) month period by two (2) of Hodge's co-workers, ending in July 2011, without more, is

34

insufficient to state a claim of a racially hostile work environment. Compare La Grande v. DeCrescente Distrib. Co., Inc., 370 F. App'x 206, 210 (2d Cir. Mar. 23, 2010) (summary order) (finding that racial comments made by the plaintiff's co-worker, coupled with threats that the plaintiff's employment would be terminated and an increase in his workload after he complained about those comments, and four (4) occasions where a company manager physically threatened the plaintiff and called him a racial slur, stated a plausible race-based hostile work environment claim sufficient to survive dismissal), with Albert-Roberts v. GGG Constr., LLC, 542 F. App'x 62, 64 (2d Cir. Nov. 5, 2013) (summary order) (finding that several incidents involving a co-worker, including a single use by the co-worker of a racial slur, cannot sustain a hostile work environment claim).

Moreover, even assuming, *arguendo*, that plaintiffs' conclusory allegations of disparate treatment with respect to the reprimands they received, including Hodge's written warning; the failure to investigate or act upon their complaints of discrimination; and Desz's glaring, excessive scrutiny and/or eavesdropping sufficiently state a claim that they were subjected to such treatment because of their race, such conduct is insufficient as a matter of law to state a hostile work environment claim.

"Hostile work environment claims under Title VII [] look to the circumstances of the plaintiff's employment, and hold the employer liable when the misconduct in the workplace is so severe [or pervasive] as to alter the terms and conditions of the plaintiff's employment." Raspardo, — F.3d —, 2014 WL 4958157, at * 13; see also Redd, 678 F.3d at 175 ("When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive

working environment, Title VII is violated. * * * Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." (quotations, alterations and citations omitted)). "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 501 U.S. at 23, 114 S. Ct. 367. "[A] plaintiff need not show that her hostile working environment was both severe and pervasive; only that it was sufficiently severe or sufficiently pervasive, or a sufficient combination of th[o]se elements, to have altered her working conditions." Redd, 678 F.3d at 175 (quoting Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 119 (2d Cir. 2010)); see also Fincher ("A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive.")

Although "[i]solated incidents usually will not suffice to establish a hostile work environment[,]" Redd, 678 F.3d at 175-76; see also Fincher, 604 F.3d at 724 ("The plaintiff must show more than a few isolated incidents of racial enmity"), "a single incident can create a hostile environment if it is sufficiently severe." Summa, 708 F.3d at 126; accord Redd, 678 F.3d at 176. "Generally, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). Severity or pervasiveness is to be determined "both subjectively and objectively[,]" Redd, 678 F.3d at 175; see also Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) ("A plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive"), and "'[t]he objective hostility of a work

36

environment depends on the totality of the circumstances,' viewed from 'the perspective . . . of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target.'" Redd, 678 F.3d at 176 (brackets omitted) (quoting Petrosino v. Bell Atlantic, 385 F.3d 210, 221 (2d Cir. 2004) (internal quotations and citation omitted)); see also Gorzynski, 596 F.3d at 102 ("[T]o analyze a hostile work environment claim, [courts] are required to look to the record as a whole and assess the totality of the circumstances * * *.")

Reprimands for disobeying a workplace rule, or the crediting of another employee's version of events over the plaintiff's version, are "insufficient as a matter of law to establish a hostile work environment." Raspardo, — F.3d —, 2014 WL 4958157, at * 21; see also Chukwuka v. City of New York, 513 F. App'x 34, 36 (2d Cir. Feb. 28, 2013) (summary order) (finding that two (2) reprimands were not discriminatory, humiliating or insulting as to constitute a hostile work environment); Batchelor v. City of New York, 12 F. Supp. 3d 458, 478-79 (E.D.N.Y. 2014) (finding that claims, *inter alia*, that the plaintiff was reprimanded twice are insufficient to establish a hostile work environment claim). Likewise, "[a] single act of being followed and glared at, even in an intimidating manner, is insufficient * * * to support a claim for a hostile work environment[,]" Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 235 (E.D.N.Y. 2014); see also Trachtenberg v. Dep't of Educ. of City of New York, 937 F. Supp. 2d 460, 472-73 (S.D.N.Y. 2013) (holding that allegations, *inter alia*, that the principal would stare at the plaintiff in an effort to intimidate her was insufficient to state a hostile work environment claim), as is excessive scrutiny or criticism of the plaintiff's performance. See, e.g. Demoret, 451 F.3d at 150 (finding, *inter alia*, that close monitoring of the plaintiff's work, criticism of the

plaintiff and mild rudeness to the plaintiff "was not so severe as to be abusive."); Nugent v. St. Lukes-Roosevelt Hosp. Ctr., 303 F. App'x 943, 945 (2d Cir. Dec. 22, 2008) (summary order) (holding that, *inter alia*, intense scrutiny of the plaintiff was insufficient to create a hostile work environment); Batchelor, 12 F. Supp. 3d at 478-79 (finding that claim, *inter alia*, of constant scrutiny regarding job performance was insufficient to establish hostile work environment claim); Colon v. Fashion Inst. of Tech. (State Univ. of New York), 983 F. Supp.2d 277, 292 (S.D.N.Y. 2013) (finding that intense scrutiny, micro-management on a daily basis and a reprimand were insufficient to sustain a hostile work environment claim); Trachtenberg, 937 F. Supp. 2d at 472-73 (finding that allegation, *inter alia*, that the plaintiff was subjected to excessive scrutiny was insufficient to state a hostile work environment claim); Plahutnik v. Daikin Am., Inc., 912 F. Supp. 2d 96, 106-07 (S.D.N.Y. 2012) (holding that excessive criticism "is generally insufficient to support a claim of * * * hostile work environment.") Moreover, a failure to investigate complaints of discrimination does "not by itself alter the terms and conditions of [a plaintiff's] employment[,]" Fincher, 604 F.3d at 724, and, thus, cannot "itself have contributed to or constituted a hostile work environment." Id.; see also Raspardo, — F.3d —, 2014 WL 4958157, at * 21 (finding that claims that an employer failed to timely investigate the plaintiff's complaint or to take timely action are "insufficient as a matter of law to create a hostile work environment.") In sum, plaintiffs' allegations amount to nothing more than "sporadic events, none of which was personally abusive, [which] as a matter of law do not amount to a series of abusive and pervasive incidents of discrimination, nor do they include a single extraordinary one." Fincher, 604 F.3d at 724.

b.     Basis for Imputing Conduct to R&R

Even assuming, *arguendo*, that the use of racially offensive terms by two (2) of Hodge's co-workers over an approximate thirty-three (33) month period ending in July 2011 rises to the level of a hostile work environment, there is no basis for imputing such conduct to R&R.

Where, as here, a co-worker, as opposed to a supervisor or manager, harasses the plaintiff, the "employer is directly liable for [the] employee's unlawful harassment if the employer was negligent with respect to the offensive behavior[,]" Vance, — U.S. —, 133 S. Ct. at 2441, i.e., "if the employer failed to provide a reasonable avenue for complaint or * * * failed to take appropriate remedial action" about harassment of which it knew, or in the exercise of reasonable care should have known. Summa, 708 F.3d at 124 (quotations and citation omitted); see also Rojas, 660 F.3d at 107 ("When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." (quotations and citation omitted)). "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." Vance, — U.S. —, 133 S. Ct. at 2453.

Even assuming, *arguendo*, that the four (4) occasions between October 2008 and July 2011 in which two (2) of Hodge's co-workers uttered racially offensive terms on R&R premises were sufficiently severe or pervasive as to have created a hostile work environment for Hodge, it cannot reasonably be inferred from the factual allegations in the amended complaint that R&R was negligent with respect to that behavior. "Once [R&R] knew or should have known about the

harassing behavior, it had a remedial obligation to address and end the harassment." <u>Summa</u>, 708 F.3d at 124. R&R satisfied its obligation to do so, as Gonzalez was promptly reprimanded and told to refrain from using racially offensive language on R&R's premises, first by Desz, one of R&R's managers, then by Lacoste, R&R's director of operations, following the first two (2) comments in October 2008 and January 2009. Following those reprimands, Gonzalez, indeed, refrained from uttering any racially offensive language for approximately twenty-one (21) months, i.e., until October 2010. The amended complaint is devoid of any factual allegations indicating that defendants even knew, or should have known about Gonzalez's use of a third racially offensive comment in October 2010. Moreover, there are no factual allegations from which it may reasonably be inferred that defendants negligently failed to remedy such conduct by Gonzalez, particularly since Gonzalez's racially offensive behavior finally stopped altogether after the October 2010 comment.

Likewise, there are no factual allegations from which it may reasonably be inferred that defendants negligently failed to remedy the racially offensive conduct by Mendez in July 2011, particularly since plaintiffs do not allege that Mendez ever engaged in any other racially offensive conduct after he was questioned about, and allegedly admitted to, making the racially offensive comments to Hodge on that one (1) occasion in July 2011. Accordingly, Gonzalez's and Mendez's purported harassment cannot be imputed to R&R. <u>See</u>, <u>e.g.</u> <u>Summa</u>, 708 F.3d at 124-25 (affirming the dismissal of the plaintiffs' harassment claims because the defendants took the needed remedial action, i.e., each complaint that was brought to the defendant's attention "was dealt with quickly and in proportion to the level of seriousness of the event.")

For all of the foregoing reasons, the branch of defendants' motion seeking dismissal of

plaintiffs' hostile work environment claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiffs' hostile work environment claims pursuant to Title VII (seventh claim for relief), Section 1981 (eighth claim for relief) and the NYSHRL (ninth claim for relief) are dismissed in their entirety for failure to state a claim for relief.[4]

E.      Remaining NYSHRL Claim against the Individual Defendants

"[A]iding and abetting is only a viable theory where an underlying violation has taken place." Falchenberg v. New York State Dep't of Educ., 338 F. App'x 11, 14 (2d Cir. June 8, 2009) (summary order). Thus, since the amended complaint fails to state a plausible claim for discrimination or retaliation, plaintiffs' aiding and abetting claim under the NYSHRL fails as well. See, e.g. Id. (affirming dismissal of the plaintiff's aiding and abetting claims because her discrimination claims failed); Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 314, 786 N.Y.S.2d 382, 819 N.E.2d 998 (N.Y. 2004) (holding that aiding and abetting claims cannot survive where the underlying retaliation and discrimination claims are dismissed). Accordingly, the branch of defendants' motion seeking dismissal of plaintiffs' NYSHRL aiding and abetting claim against the individual defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and that claim (tenth claim for relief) is dismissed in its entirety for failure to state a claim for relief.

---

[4] In light of this determination, it is unnecessary to consider defendants' remaining contention seeking dismissal of Hodge's Title VII hostile work environment claim as time-barred.

F.    Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires."  However, leave to amend is not required where a proposed amendment would be futile, see Krys v. Pigott, 749 F.3d 117, 134 (2d Cir. 2014); Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012), cert. denied sub nom Curtis Circulation Co. v. Anerson News, L.L.C., 133 S. Ct. 846, 184 L. Ed. 2d 655 (2013), "as when the proposed new pleading fails to state a claim on which relief can be granted." Krys, 749 F.3d at 134.  Leave to amend may also properly be denied for: "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [and] undue prejudice to the opposing party by virtue of allowance of the amendment * * *.'" Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)); see also TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014).  Furthermore, "[a] plaintiff need not be given leave to amend if it fails to specify * * * how amendment would cure the pleading deficiencies in its complaint." TechnoMarine, 758 F.3d at 505-06.

Since, inter alia, plaintiffs already amended their complaint once after defendants advised them of the pleading deficiencies in their original complaint, but failed to cure the pleading deficiencies in their claims against defendants, and have "made no showing as to how they might amend their [amended] complaint to cure their pleading deficiencies," D. Penguin Bros. Ltd. v. City Nat'l Bank, — F. App'x —, 2014 WL 5293242, at * 6 (2d Cir. Oct. 16, 2014) (summary order), their request for leave to amend is denied. See, e.g. TechnoMarine, 758 F.3d at 506 (affirming denial of leave to amend where the plaintiff already amended the complaint once

without resolving its pleading deficiencies and "entirely failed to specify how it could cure its pleading deficiencies" in a second amended complaint).

III.  CONCLUSION

For the reasons set forth above, defendants' motion to dismiss plaintiffs' claims in the amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted; plaintiffs' request for leave to amend their amended complaint is denied; and plaintiffs' claims against defendants are dismissed in their entirety with prejudice for failure to state a claim for relief. The Clerk of the Court shall enter judgment in favor of defendants and close this case.

SO ORDERED.

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated: November 17, 2014
        Central Islip, New York